WILLIAM WARD *v.* THE HEIRS OF ARTHUR FOX, WILLIAM
WOOD and SIMON KENTON.

· *In Chancery.*

This was an appeal from a decree of the district court held in
Washington.

The suit had been brought in the court of appeals, and removed
from thence to the said district court for trial, when the original
jurisdiction of the court of appeals was taken away.

The appellant, who was complainant in the district court, thus
stated his case in his bill:

That, being possessed of a military land warrant for 2,000 acres
of land, he contracted with a certain Simon Kenton to locate the
same on waste and unappropriated land, and to superintend the
surveying of it when located; and in consideration of the said
Kenton's locating and superintending the surveying of the same,
he, on his part, agreed to pay all costs and charges that might
attend the surveying of the same, and to divide the land aforesaid
in quality, having regard to all local conveniences, and choosing
1,000 acres thereout, to make the said Kenton a title to the remain-
ing 1,000 acres.

That, in consequence of the said agreement, the said Kenton, on
the 19th day of April, in the year 1780, made an entry on the said
warrant in the following words:

"William Ward, heir to James Ward, enters 2,000 acres, by
virtue of a military warrant, on a branch of a north fork of Lick-
ing, called Wells' branch, including the mouth thereof, joining
Cameron's settlement and pre-emption on the west side, and
Beckley on the south, to begin at the head of said branch, and to
run down for quantity."

That on the 25th day of November, 1784, the said Kenton pro-
cured the said entry to be surveyed by a certain William Henry,
a deputy surveyor, the said Kenton acting as pilot, and directing
the manner of making the said survey.

That the said survey being recorded in the surveyor's office, a
plat and certificate thereof was lodged in the deputy register's

office, and the fees due thereon paid the 23d day of November, 1786. But a certain Matthew Rust, having entered a caveat against his obtaining a patent on the said survey, he was prevented from obtaining the same until the 5th of November, 1790.

That at the time of the entering into the said contract with the said Kenton, he was, and continued to be, until about the month of ———, 17—, an inhabitant of Green Brier, in the State of Virginia, during which time repeated applications were made to him by the said Kenton, for a division of the said land, and that he was threatened by the said Kenton with a suit for not complying with the same.

That in April, 1790, the said Kenton divided the whole of the said tract as surveyed into two parts, and called on him to make a choice of one of them. That he accordingly made choice of the west side of the said tract, being the part next to the town of Washington, and the said Kenton then took, and has ever since kept, possession of the other half; and that the said Kenton, at the time of the said division, gave him no information of any claim set up to any part of the said land.

That the said Kenton, on the 28th day of June, 1780, made an entry with the surveyor, in the words following, to-wit :

"Simon Kenton, assignee of Thomas Marshall, enters 2,200 acres on four treasury warrants, on the waters of the North fork of Licking, adjoining Ward's entry, upon a military warrant, on the north-west side, and George Dickens and George Clark on the north, and Frazier's settlement and pre-emption on the south, including an improvement made by John Ross on the head of the right hand fork, and another on the second right hand fork, made by Alexander McClelland, and to extend north and northwardly for quantity, adjoining Frazier also on the west side."

That on the 3d day of November, 1785, the said Kenton by written articles of agreement, sold and conveyed to William Wood and Arthur Fox, all his right and claim in and to divers tracts of land therein enumerated, and among others to his said entry of 2,200 acres of land adjoining his entry of 2,000 acres.

That in the month of March, 1789, the said Arthur Fox, being then a deputy surveyor, went on the said land, the said William Wood also attending as marker, and made a survey on the said Kenton's entry for 2,200 acres of land.

That the said survey was made contrary to location, and so as to interfere considerably with his survey, and that the said Fox

shortly afterward returned a survey to the surveyor's office, bearing date the 10th day of August, 1788, as being made on the said Kenton's entry of 2,200 acres of land, by which said survey, he interfered with his prior survey about 380 acres, being considerably more than the interference caused by the lines as run by the said Fox in March, 1789.

That the said Fox did not make any survey on the said entry, until March, 1789, that then his chain-carriers were not sworn, and that he run at that time, lines very different from those he had returned in the said survey; and that two of the corners as returned in the said survey were then not made, but were long since marked as such by the said Wood and Fox, or by their procurement; and that the first time he was on the land in dispute with the said Wood and Fox, they showed him a sugar tree on the line of his survey, about 55 poles from his north-west corner, which they informed him was his corner, and that the line running from it north 88 east, was his line, and the said Fox told him that he had made that line and corner.

That the survey having been thus fraudulently made and returned, and also registered, a patent has issued thereon in the name of the said Wood and Fox, as assignees of the said Kenton; and the said patent, although the survey on which it issued was dated and registered so long after his survey, is elder than his, in consequence of his patent being tied up by Rust's caveat, as is before mentioned.

That the said Wood and Fox had the fullest notice of his said claim, and of the manner in which it had been surveyed, before their purchase from Kenton, and before their making the said survey on the entry of 2,200 acres, as would appear from the following circumstances: The said William Henry having been on the ground to make his survey prior to the time at which he completed the same, applied to the said Fox to finish the said survey for him, and give him a memorandum how to find his corner as returned by Henry in his said survey.

That the said Henry, at the time he first went on the ground to make the said survey, was also employed by Kenton to survey his said entry of 2,200 acres, and having then run the lines of the said entry of 2,200 acres adjoining his survey, agreeably to his said survey and patent, although the said Henry did not then complete the survey on the entry of 2,200 acres, applied to the said Fox to finish the said survey of 2,200 acres for him, and informed him of the lines which he had run for the same.

That the said Kenton had, twelve months before he sold the said entry of 2,200 acres to Wood and Fox, directed the manner in which his said entry of 2,000 acres should be surveyed, and had also directed how his own entry of 2,200 acres should be surveyed, so as to join his line as then surveyed, and since patented.

That the said Kenton, before he sold the said entry of 2,200 acres to Wood and Fox, informed them where his line of the 2,000 acre survey was, and that it was Wells' branch and not Wells' creek, that he intended by the call in the entry, and that the said Wood and Fox not only knew the situation of the line, but also showed it to others as being his line; and the said complainant prayed for a conveyance of the interference.

To which the defendants Wood and Fox made the following answer:

That on the 3d day of November, 1785, they purchased from Simon Kenton a large quantity of land, part of which was the 2,200 acres of land in the bill mentioned.

That on the 15th day of March, 1786, the said Kenton passèd his receipt to them, expressing he had received full satisfaction for the land sold by him as aforesaid.

That the said Kenton informed them that the said 2,200 acre entry was a safe one, and that he believed not one acre of it would be lost, but that neither before the purchase from the said Kenton, nor since, did they ever understand from the said Kenton, that the said Kenton had ever directed how the said entry of 2,200 acres was to be surveyed.

That they did not think the entry of the said William Ward was accurately set forth in the bill; and they expressly denied that his survey was made agreeable to his location.

That they knew nothing of the division spoken of in the bill, or whether the said Kenton did or did not inform the said Ward of any claim set up to any part thereof; but that the morning after the said Ward came from Virginia to the land in dispute, they both informed him particularly of the situation of their claim, by virtue of the said 2,200 acre entry; and the said Wood did then discharge the said Ward from settling on the lands claimed by them.

They denied that the said 2,200 acre survey would have interfered with the claim of the said Ward, if he had not surveyed contrary to his location, and also included 2,500 acres in his said survey instead of 2,000 acres.

They admitted that they were apprised before they purchased

of Kenton, that the said 2,200 acres of land joined a 2,000 acre tract of the said Ward, but they denied that they knew any thing respecting the manner in which it was surveyed, nor did they ever hear the said Kenton say it was or was not surveyed agreeable to location; and said they were perfect strangers to the lines, till after the purchase aforesaid.

They positively denied that before their purchase of the 2,200 acre entry from the said Kenton, the said Kenton, or any other person ever informed them, or either of them, where the lines of the said Ward's survey were, or that it was Wells' branch and not Wells' creek, that the said Kenton intended by the call in the said Ward's entry.

That since the contention between the said Ward and them, the said Kenton has told them he meant Wells' branch, and not Wells' creek; but they only considered it as an evasion arising from the interested situation of the said Kenton, for, ever since they had any knowledge of that country, that whole stream had been called and known by the name of Wells' branch, even by the said Kenton himself; that the line spoken of by the said Henry in his memorandum was never run until many years after the survey of the said Ward was returned.

That the said Kenton was improperly made a defendant in this suit, because he would be benefited, if the said Ward prevails, and prejudiced if he did not.

To that part of the bill to which Arthur Fox was particularly called upon to answer, he stated that he could not tell at what particular time he made the survey on the entry of 2,200 acres, but thought it was made in March, 1789.

That he was several years trying lines and making surveys around and adjacent, before he was enabled to make it, as a number of the adjacent claims were of greater dignity, and that it was not until the said claims were reduced to certainty by surveys, that he could make his.

That he might have run some of his lines with one set of chainmen in 1788, and others by a different set in 1789, and that this would account for the error in the date of the survey.

That he could not positively say, whether the chain-carriers were sworn or not, but that he was satisfied in his own mind, that he never made that, or any other survey which he intended to return to the office, without swearing the chain-men.

That he never did make two different surveys on the entry of

Ward v. Fox's Heirs.

2,200 acres, but that he recollected making an experiment, where the said Ward's line ought to be, and beginning at the head of a fork of the branch.

That he run all the lines of the said survey, except a short one from Bryan's south-east corner, to the beginning, being the closing line, but with different sets of chain-men, and at different times.

That every corner of the said survey was marked by him, or by his direction, at the time of the making the same, except those on the lands of others which were made before; that he recollected to have been twice on the disputed part, and with two different sets of chain-men, and that the chain-men returned in the survey were on that part but once; but had been oftener on the other parts of the survey.

That some time in the year 1785, he received a memorandum from William Henry, in which he was requested to finish the survey of the said William Ward of 2,000 acres, as Simon Kenton should direct him; but that the said Simon Kenton never did direct him, and the corner called for in the memorandum to begin ·at, he never saw.

That neither Henry, Kenton, or any other person, ever applied to him to make or finish the said 2,000 acre survey, before or since the purchase, nor was he ever informed that the said Henry or any other person, had run any of the lines, or attempted to survey the said entry; nor was he ever requested by the said Henry to run any other lines than those mentioned in the said memorandum, which, after receiving, he thought no more of, but it lay several years among his papers forgotten.

William Wood, in answer to the part of the bill he was particularly called upon to answer, and to which his answer was not the same as Arthur Fox's, stated that he did not know at what time the survey of 2,200 acres was made, or whether the chain-carriers were sworn or not, but expressly denied that he ever marked a tree for a corner of the said survey, after the marks thereof were returned, but that if any tree was afterward marked by him, it must have been for some of the corners and boundaries of the town lots.

That he never knew or was informed by the said Kenton, or by any other person, in what manner the claim of the said Ward was to be surveyed, or that it was surveyed, and that he had never heard that William Henry had made, or was to make the said

survey, or had surveyed or was to survey the said 2,200 acre entry, or that Kenton was to direct the same, until about the commencement of this suit.

That he did never show any person the lines of the said Ward's survey at the time stated in the bill, nor did he mark or procure to be marked, nor did Arthur Fox to his knowledge or belief, the corner trees stated in the bill, but he admits they showed the sugar tree and line, as what ought to be considered the said Ward's line and corner.

Simon Kenton, in his answer, made the following statement: That he entered into such agreement with, and made such entry for the said Ward as is set forth; that he caused the survey to be made for the said Ward, and directed the manner of its being run, that he sent to the said Ward several times desiring him to have a division made of the said land as surveyed, and that he did about the time mentioned, agree with the said Ward on a mode of dividing the land, that the said Ward should have the west side of it, and he the east side of it, and that he did not prior to, or at the time of making the division with the said Ward, inform him of any interference which existed, with the survey made on his entry of 2,200 acres, neither did he at any time know that it had been surveyed so as to interfere at all with Ward's claim.

That shortly after Ward's survey was made, he had employed William Henry to survey his entry of 2,200 acres, and went with him on the ground to direct the manner of making the said survey, and continued with him there until after they had passed Ward's line a considerable distance, having made Ward's line for a considerable length the line of his survey; that they then left the survey unfinished, and Henry afterward informed him that he had employed Arthur Fox to finish the survey, and the said Fox having, after the purchase made of this defendant, completed the survey, this defendant, as well as he recollects, assigned the same to the said Wood and Fox, upon a supposition that it had been made conformable to the lines which had been before run by the said Henry, neither did the said Wood or Fox inform him, that any alteration had been made in the manner of running those lines.

That he knew nothing of the time or manner in which Fox made the survey on his said entry, but has understood and believes that he got from the said Henry his field notes as far as he had run the lines of the said entry.

Ward *v.* Fox's Heirs.

That the complainant's entry has been surveyed so as to begin at the same place, and run the same courses, which he intended it should by the entry, but it has covered a greater quantity of ground than he expected it would have done.

That prior to his sale to the said Wood and Fox, he repeatedly informed the said Fox that it was what is now called Wells' branch, and not Wells' creek that he meant by in the call in Ward's entry, but does not recollect having given the defendant Wood this information, but he saith that prior to his sale to Wood and Fox, he often told and showed them both how the lines of the said Ward's survey had been run.

The annexed connected plat, No. 41, was returned in this cause, of which the following is an explanation :

A B C D, the complainant's survey on his entry of 2,000 acres, containing 2,598 acres.  *a b c d e f g h i k l m n o p*, the defend-

ants Wood and Fox's survey made on their entry of 2,200 acres purchased of Simon Kenton. G H I J, William Beckley's settlement. G H K L, pre-emption, ditto. A M N O, Angus Cameron's settlement. M N O P Q R, Andrew Crockett, assignee of Cameron's pre-emption of 1,000 acres in two surveys. S T, shown by Simon Kenton as the two springs called for in Cameron's entry. U V, a line shown by Robert Downing as the only one he was on with Arthur Fox, and V was a corner to the town, and the same line was shown by Luther Colvin, one of the chain-men. V W X Y Z, Edmund Byne's survey of 1,000 acres. X 1 2 3, Simon Kenton's settlement survey. 2 3 4 5, pre-emption ditto. *h i k* 6 7 8 9 10, John Marshall's 1,790 acre survey. 9 11 12 13 14 15, Simon Kenton's 300 acre survey. *e f* 16 17, George Clark's settlement and pre-emption. *l m n X,* James McKinley's pre-emption of 1,000 acres. 22 23 24 25, Dickens' pre-emption. 5 18, Y Z 19 20 21, John Prior's survey of 6,000 acres. [] in the northwest corner of the complainants' survey, represents Richard Corwin's lot. *A* to *B,* Wells' creek by actual survey. *C* to *D,* Wells' branch as described by Kenton, and said to be so called, because Wells had a path down it. *C* to *E,* the right hand fork of Wells' branch. *F F,* the right hand fork of Wells' creek. *G* to *G,* the war road called for in Cameron's entries. *R,* shown by Simon Kenton as John Ross' improvement. *Mc,* shown by ditto, as Alexander McClelland's improvement. *H H,* the big West fork of Lawrence's creek. *I R,* the right hand fork of Lawrence's creek. *J Mc,* the second right hand fork of Lawrence's creek. *K,* McClelland's camp. *B,* the spring at the head of Wells' creek. *D,* the sugar tree shown by the defendants as what ought to be considered as Ward's boundary. *S S,* part of the main street in Washington. *w,* a place shown by Ward, where the old road crossed the branch he lives on. ⋈ ⋈, Fox's spring and cabins, and the main road at the mouth of his lane. *Y,* Dougherty's house. *G* [], Dexter's camp. The large water course at the top of the plat, the Ohio, that at the bottom, the North fork of Licking.

The following certificates and entries were used at the trial:

"April 19, 1780. William Ward, heir-at-law to James Ward, enters 2,000 acres of land by virtue of a military warrant, on a branch of the North fork of Licking, called Wells' branch, including the mouth thereof, joining Cameron's settlement and pre-emption on the west side, and Beckley's on the south, to begin at the head of the said branch, and to run down for quantity."

"Simon Kenton, assignee of Thomas Marshall, enters 2,200 acres upon four treasury warrants, on the waters of the North fork of Licking, adjoining Ward's entry upon a military warrant on the north-west side, and George Dickens and George Clark on the north, and Frazer's settlement and pre-emption on the south, including an improvement made by John Ross on the head of the right hand fork, and another on the second right hand fork made by Alexander McClelland, and to extend north and north-westwardly for quantity, adjoining Frazer's also on the west side."

"January 4, 1780. William Beckley this day claimed a settlement and pre-emption to a tract of land in the district of Kentucky, lying on the head waters of Cooper's run, waters of Licking creek, withdraws his location, but proves to the court that he settled in the country in the year 1777, and that he resided in the country ever since, and that he is entitled to a settlement and pre-emption."

"January 11, 1780. It was proved to the court the 4th instant, that William Beckley had a right to a settlement and pre-emption, though he did not at that time locate it, now comes into court and locates the same on the waters of Licking creek, and on the head of the first left hand fork of Lawrence's creek, about four miles from the mouth of Limestone. Ordered that a certificate issue accordingly."

"February 3, 1780. William Beckley enters 400 acres by certificate, etc., lying on the waters of Licking creek, and on the head of the first left hand fork of Lawrence's creek, about four miles from the mouth of Limestone."

"April 29, 1780. William Beckley enters 800 acres upon a preemption warrant joining his settlement on the first left hand fork of Lawrence's creek, on the waters of Licking, four miles from Limestone."

"February 18, 1780. Angus Cameron this day claimed a settlement and pre-emption to a tract of land in the district of Kentucky, on account of residing in the country twelve months before the year 1778, lying at the head of the right hand fork of Wells' branch, extending south-east to the head of a small run that empties into the North fork of Licking, including the spring on the head of both branches, about one and a half miles above the war path, that crosses the North fork. Satisfactory proof being made to the court, they are of opinion that the said Cameron has a right to a settlement of 400 acres of land to include the above location, and the pre-emption of 1,000 acres adjoining, and that a certificate issue accordingly."

"February 14, 1780. Angus Cameron enters 400 acres by certificate, etc., lying on the head of the right hand fork of Wells' branch, extending south-east to the head of a small branch that empties into the North fork of Licking, including the spring on both branches, about one and a half miles above the war path that crosses the North fork."

"June 24, 1780. Andrew Crockett, assignee of Cameron, enters 1,000 acres upon a pre-emption warrant, lying on the head of the right hand fork of Wells' creek, extending south-east to the head of a small run that empties into the North fork of Licking, including the spring on both branches, about one and a half miles above the war path that crosses the North fork."

The answers of Ward, in other suits in chancery brought to settle disputes respecting the same claim, were used at the trial to show Ward's acknowledgment, that he had conveyed only a small part of the land to Kenton, or his assigns, and that those conveyances had been made, during the pendency of the suit.

The depositions used at the trial were to the following purport:

John Virgin deposed, that about the last of April, or the first of May, in the year 1776, he in company with Simon Kenton and others, landed at Limestone and traveled out into the country; that they crossed the East fork of Lawrence's creek, and came to the cane-brake, where the town of Washington now stands, at which place the company turned off to the south-east, and crossed a small stream, which had a blazed trace or path down it; which trace or path was said by some of the company to have been marked by a man or men of the name of Wells and company, who had been improving in the neighborhood, and had marked the path or trace from the river out to the improvement.

That in crossing the above mentioned branch, the company called it Wells' run, it being but a small stream. That the company he was in, had a station camp near the head of the right hand fork of what is now called Wells' creek, and from thence had frequent occasions in hunting, and otherwise, to cross the branch above spoken of, down which the path run, and that that stream was then always called Wells' branch or Wells' run.

That he had lately explored the neighborhood of the said station camp, made as aforesaid in 1776, had found it, and from thence had retraced his hunting ground, and found also the stream which was then called Wells' branch, and in consequence of the said researches, had enabled himself to say with certainty what branches were then called Wells' branch.

Ward *v.* Fox's Heirs.

That the said left hand fork of the stream, was the branch then called Wells' branch, which had the blazes down it; and that he in his searches had seen blazes down the branch, which he believed were the same made as, was said by Wells and company.

That after the right hand fork of the stream joined itself with the branch called Wells' branch, the stream went by the name of Wells' creek, which name was given to it in consequence of there being an improvement said to have been built by Wells and company, some distance below on the creek.

That Thomas Dickerson, Harry Dickerson, John Boggs, Rezin Virgin, John Lyon, James Kelly, William Markland and William Braden or Graden, were in company; and that he understood that none of the company had ever been in Kentucky before. That they met with Simon Kenton at Cabin creek, and he was not one of the original company, and might or might not have been in Kentucky before that time.

John McCausland deposed, that in the beginning of April, 1776, he, in company with William Biggs, George Dickens and James Duncan, came down the Ohio and landed at Limestone, where they were met by a man who called himself Simon Butler, who is the same now called Simon Kenton.

That after securing the lading brought down the river, they traveled out from the river along a war path for some distance, and turned off the path to a camp the said Kenton had on Lawrence's creek, at which camp they stayed some time, but how long he could not say, and being conducted by the said Kenton, the said company, to wit: Kenton, Dickens, Biggs, and himself turned to the said path, which they struck in a cane-brake, which formerly stood where the town of Washington now stands.

That the company from thence turned off to the left hand, and proceeded across the country until they came to a spring, which is one of the head springs of the left hand fork of what is now called Wells' creek, at which spring they made an improvement.

That continuing down the stream, they built another cabin at another spring, on the left hand side of the stream; that he was then informed by Simon Kenton, that the branch on which they improved (and down which, as well as he recollects, there was a blazed path) was called Wells' branch.

That the company continued on down the branch, till they came to the junction of the said branch with another branch, which came from the eastward; and after the junction the said Simon

27

Kenton told him and the rest of the company, that the stream was called Wells' creek.

That he had traversed the left hand fork of the creek, and had retraced the course of the company from the said camp on Lawrence's creek, to the spring at which they improved.

That he had found the springs, and knew that they were at the head or near the head of the left hand fork of the creek. That he knew also that the left hand fork of what is now called Wells' creek, or some part thereof, was called Wells' branch, and that the stream assumed the name of Wells' creek, either at the junction of the right hand fork of the stream, or at the junction of the first right hand fork of the left hand fork; but at the mouth of which of those branches the name of the stream changed, he could not say, but that he well recollected that there was a distinction at that time, and that the distinction took place at the mouth of the one or the other of said branches.

That ever since that time he has known of the distinction between Wells' branch and Wells' creek, and that a part of Wells' creek was called and known by the name of Wells' branch at that time.

That he had never been in this part of the country since 1776, till August, 1798; that his long absence disabled him from pointing out the particular spot where the name of Wells' creek began, though he well recollected that the distinction did prevail.

Thomas Warring deposed, that in the year 1786, John Virgin landed at Limestone in company with Rezin Virgin, brother to said John, and that in the course of a slight acquaintance, he the said John, without any provocation, abused him with very ill language, that he forbore to resent the abuse, as his brother Rezin interposed, and begged him to take no notice of him, alleging that he, the said John, was not in his proper senses, which had been deranged by a fall or hurt.

That several years after, he fell in company with said John, who observed to some persons in company with him, that he wanted to fight that person once, meaning him; but that he refused to fight, which induced him to suppose whatever might be the state of said John's intellects, his memory was sound and retentive as to that fact.

That in the year 1788, or 1789, as well as he recollects, said Virgin was brought before him (who then acted as a justice of the peace), for horse-stealing, in company with two other men who

were apprehended for the same fact, who acknowledged that they had taken a horse they had found in the road near where Millersburg now stands, that John Virgin said he had intended to take the horse up as a stray, as he was a freeholder in the county.

That the said Virgin, and others, put their packs on the horse, and turned him out in the cane-brake, when they came near Washington. That he had not time to attend to the business, and left him on trial before Mr. Conway who acted as a justice.

That the evidence who came forward against Virgin, said they had tracked a horse from the feeding ground near Millersburg, into the road where he had been caught, and had been informed by some person, a horse such as they described, had been seen in the possession of said John Virgin and others, at the Blue lick.

John Gutheridge deposed, that he had been acquainted with John Virgin ever since the year 1775, and that he never was considered as a man of credibility; that some time since his first acquaintance with him, he understood from said Virgin's connections, that he got a fall from a horse in riding a race, and that it had deprived him, in a considerable degree, of his natural reason.

That he has been acquainted with the said Virgin since the fall from the horse, and can not say whether it injured his understanding or not, as he never thought him a man of common understanding.

That he never heard any thing to impeach the honesty of said Virgin, until about the year 1788, or 1789, he was apprehended in this county for stealing a horse, and he understood he made some compromise with his pursuer by paying for the said horse.

John Stockden deposed, that he had seen the blazed path down what was called by Kenton, Wells' branch, but that until the commencement of this suit, he had never heard the distinction of Wells' branch and Wells' creek.

William Henry deposed, that some time in the year 1784, as he believes, he was employed by Simon Kenton to make a survey, including a part of the present town of Washington, in the name of the complainant, William Ward, on an entry on a military warrant for 2,000 acres of land; that he run all the lines and made all the corners for the said survey, under the directions of the said Kenton, except the last corner and line, in which situation he left it, and employed a certain Arthur Fox, late of the said town, to finish it, agreeably to a paper of written instructions to this effect, to go to the south-west corner of William Beckley's settlement, and run

a due west course, until he should intersect a line of said survey running north, which he had made; at which intersection he directed him to corner for Ward.

That when on the ground he was prevented from making the last corner by a difference between the chain-men, as to the number of outs they had run, and being afterward prevented from going on the ground again as he had intended, he employed the said Fox to finish the survey for him, who reported to him that he had run the line, and he paid him for doing it, and then returned Ward's survey agreeably to the lines run by himself, and the line which the said Fox had reported to him that he had run as stated above.

That when he employed Arthur Fox to finish the above mentioned survey for him, he gave him a copy of the courses and lines which he had run and made for the said survey; and as well as he now recollects, he returned the said survey in the year 1784 or 1785.

That he was at the same time employed by the said Kenton, to make a survey for him on an entry for 2,200 acres in his own name, that he began to make the said survey, and run a number of lines for the same, under the direction of the said Kenton, but stopped before he had completed the same, by the direction of the said Kenton, because as they then understood, the said Kenton was apprehensive that the said survey, as they were then making it, would interfere with some prior claim.

That the said paper hereto annexed and signed William Henry D. S. is a copy of the lines then run by him for the said survey, as taken by him from his field-book.

That when he was making this survey, it was his intention in consequence of directions then given to him by the said Kenton, to make use of a part of the line of Ward's 2,000 acre survey, as above mentioned, as part of the lines of Kenton's said survey of 2,200 acres.

That he left the survey in the name of Kenton in an unfinished state also, and that his contract with the said Fox was to finish for him all his unfinished business on the north side of Licking, and that he furnished him with every necessary means, to enable him to finish all his unfinished business in that quarter; that he considered this survey as a part of his unfinished business then; but does not recollect particularly that he gave the said Fox the copy of the courses which he had run for the said survey of 2,200 acres.

That he first became acquainted with that part of the country, in the year 1783, or the spring of 1784, that the mouth of the branch, which was included in Ward's survey, was then called by Kenton, Wells' branch; and Kenton showed him the mouth of the branch as the one which was called for in Ward's entry; and there were then old blazes up the branch, which the said Kenton then said he was acquainted with. Upon being interrogated by the defendant's attorney, he said, that in consequence of the dispute between the chain-men, he run some distance further, blazing, but as well as he now recollects, without marking the line further than the place where the dispute took place.

He further said that he was employed by Kenton to make these surveys as a deputy surveyor, aand without any special agreement between them concerning the fees.

That by his contract with Fox, the said Fox besides finishing his business as a surveyor was to make some surveys for himself. Upon being asked whether he returned the corner called for in Ward's survey, as reported by Fox, or whether he supposed the corner, he said he could not be certain.

That he made Beckley's survey, to whose corner he intended to have run Ward's line. That he made his contract with Fox in 1784, or in 1785, but that he could not be certain which, but was rather inclined to believe it was in 1785. Upon being asked whether he was certain he returned the survey after Fox had made his report to him, he said he could not be certain.

The following paper was annexed to the said deposition, to-wit: "Surveyed for Simon Kenton —— acres of land. Beginning on Beckley's south-west corner, thence with his line north, 308 poles, to his north-west corner passing the same, in all 408 poles, to two sugar trees and a hackberry tree; thence west, 152 poles, to three buckeyes and a honey locust, in a line of Byne's 1,000 acre survey; thence with his line south, 308 poles, to two sugar trees and a box elder; thence west, 360 poles, to an elm and hoop ash in McKinley's line; thence south with his line, 160 poles, to a white ash and elm, south-east corner of same; thence west, 352 poles, to a hackberry."

William Henry, in a second deposition, deposed, that in or about the year 1790, the complainant, Ward, came to his house, and informed him that Arthur Fox had not made the north-west corner of the said Ward's 2,000 acre military survey agreeably to his directions to the said Fox; that in consequence thereof he went with the said Ward to Mason, and made the said north-west corner

on the same kind of trees, as well as he recollects, which were called for in the said Ward's certificate of survey.

That the said corner was made, beginning at Beckley's south-west corner, and running a due west course, until it intersected a line to run north from the said Ward's south-west corner.

Being asked by the defendant, whether he paid Arthur Fox any consideration to make the above corner, or to do any other survey-ing business for him, he said that Fox and himself had entered into a written contract, by which the said Fox was to do a good deal of surveying for him, but the particular consideration he was to receive for making the above corner, was as follows: He had nearly finished a survey of 10,000 acres for the heirs of John Moseby, on the waters of Johnston's fork, and agreed to give up to said Fox, the use and benefit of his labors on that survey, in con-sideration of his finishing Ward's survey aforesaid; that this con-tract was made about the latter end of March, or the first of April, 1785.

Robert Downing deposed, that he was in company with A. Fox, when surveying near the town of Washington, but is not certain whether he carried the chain the first day or not, in a line which began inside of a clearing made by George Balla, and run on the upper side of Dexter's camp and passed near Dougherty's cabin on the left, and run through the corner of a piece of ground at Fox's station staked off, which is the same line shown to the surveyor by him; this line he understood from the said Fox, was the line between the town of Washington and one Ward.

That the party stopped the first night, and the next day pro-ceeded on by various directions trying or running lines, between John Kenton's and Meredith Helm's and onwards, where John Downing lives; but he does not know for what purpose the lines were run, but thinks they were run in the spring of the years 1788 or 1789.

That he believes Fox's station was settled at the time the first mentioned line was run, but does not remember whether or not he was sworn as a chain-carrier on the occasion, and that this was the only time he carried the chain south or south-east of Washington, after said Fox.

That he believes the line shown by him to the surveyor was marked by said Wood. That the beginning of the line shown the surveyor he understood was the boundary between the town of Washington and Ward, but does not know how far it extended as such.

That he has lived in Washington ever since the year 1786, and has known the creek Ward's survey is made on, and it has been generally known by the name of Wells' creek, and the different forks the branches of Wells' creek; but that he never knew any particular prong of the creek called and known by the name of Wells' branch.

Thomas Young deposed, that in the month of May, 1775, he landed at Limestone, in company with two men of the name of Wells and others; that they attended to other business lower down the river, and returned to Limestone some time in June following; that then he, with one of the Wells, and some of the others, came out into the country to improve lands, and that as well as he recollects, they built two cabins on the waters of the creek now called Wells' creek, which was then by that company called Battle fork, from a fight which at that time took place between two of the company on that creek.

That he felt confident that there was no path or blazes marked down that creek, or any of its branches that year, by Wells, or any of the company, as he was with them the whole of the time they were improving on that creek.

That they proceeded on and built some cabins on the North fork of Licking, one for Samuel Wells, at the mouth of the creek, now called Mill creek, which was by the company at that time called Wells' creek, from Wells having an improvement at the mouth.

That about the last of the same month, or the first of July, they ascended the Ohio, and did not return to Kentucky until the fall of the year 1783.

That about that time he had a conversation with Simon Kenton on the subject of the situation and names of the aforesaid creeks; that the creek they called Battle fork, Kenton called Wells' creek; and what they called Wells' creek, Kenton called Mill creek; but that Kenton, at that time, made no distinction of Wells' creek and Wells' branch, that he recollected, but spoke of the whole stream as bearing that name, and the different branches waters thereof.

That in the spring of the year 1784, he came to the neighborhood in company with the said Kenton and others, to view his improvement, which is on and near the head of the creek now called Wells' creek; they traveled some distance up one of the forks of said creek, and that it was then called Wells' creek by said Kenton, and appeared then to be generally known by that name; and that he has been acquainted and resided in the neighborhood

ever since the last mentioned time, and has always known that stream by the name of Wells' creek or Wells' branch, and the different branches falling into it waters thereof, and he never heard of any distinction of Wells' creek and Wells' branch, until since the present suit between the parties.

William Triplett deposed, that in the year 1775 he was in Kentucky with Samuel Wells and others; that he assisted to make improvements with that company, but that they were on the North fork; that he recollects nothing of the stream now called Wells' creek low down, nor did he know of any road or path being blazed from the river out.

That in July, 1776, he was in Kentucky again with Wells; that in that year the company marked a path from the mouth of Mill creek to the east fork of Lawrence's creek, and he thinks that path crossed the heads of the branches of Wells' creek, but did not remember going down any stream but Lawrence's creek, nor did he know that what is now called Wells' creek had any name at that time, and that he first heard of it in the year 1783 or 1784, by that name; but that he never heard of any distinction between Wells' creek and Wells' branch till the dispute between the present parties.

That when he was in this country, in the year 1785, he was not generally out with the company improving, but kept the camp.

William Markland deposed, that in the year 1776, he, in company with John Virgin, Rezin Virgin, John Boggs, and others, landed at Cabin creek, on their way to Kentucky; that at Cabin creek, Simon Kenton came to the company, and they, together with Kenton, from thence went to Limestone.

That he and John Lyon were left at Limestone, and the rest of the company, under the guidance of Kenton, went into the country to improve.

That after some time, Rezin Virgin came to Limestone, and went with the said Lyon and himself to a station camp which the company had made; that he stayed but two nights at the camp with the company, and the next morning the company all went to the more southern waters of Licking.

That John Virgin was out with the company the whole time; that he heard the company speak of Wells' branch, or Wells' creek, but which he does not now know, and that he thinks he never did know what stream was known by that name, owing to his having been so short a time with the company in that neighborhood.

That he has this day been to the station camp above alluded to, and recollects the place very well; and that it stands on the right hand branch of the stream.

William Beckley deposed, that in the fall of the year 1784 he was present, and believes he carried the chain on a part of the complainant's military survey of 2,000 acres, beginning at a mulberry in his settlement, and which he was informed by Simon Kenton and William Henry, who were both present with him, was the corner of the complainant's military survey.

That he, Kenton and Henry, and others, traced a marked line from said mulberry southwardly, which line he understood, by Henry and Kenton, was the dividing line between Cameron's settlement and pre-emption and the complainant's said military survey, and which he, the said Henry, had marked the preceding spring.

That the first branch that they crossed on this line, he was informed by said Henry and Kenton, was the waters of Wells' creek; that after crossing this branch they continued running southwardly a considerable distance, and then turned westwardly and run a considerable distance, and crossed Wells' creek, as he was informed by Kenton and Henry.

That after crossing the creek and running nearly to, or on the top of the hill, they made a corner, but on what trees he did not recollect; but remembered there was a great deal of oak timber near it.

That from this corner they proceeded north a considerable distance on another line of the said military survey, and left it unfinished without making a corner.

That during the latter part of the year 1784 and beginning of 1785, he carried the chain and hunted for the said Henry as surveyor for sixty or sixty-one days; and that when he first entered chain-carrier he was sworn by said Henry, but whether at this survey or not he does not recollect; but inclines to believe this was among the first made.

That he never was sworn but once, and then generally, for all his services as chain-carrier under the said Henry.

That he had known the creek on which the complainant's survey is made from the fall of 1784, and had generally heard it called Wells' creek, and the different branches, branches of Wells' creek; and that he never heard that the branch which heads in his settlement was called Wells' branch, and that the fork which he mentioned crossing was the right hand fork of said branch until lately, since the commencement of this suit.

That he never heard Simon Kenton call the said creek by any other name than Wells' creek, and the different branches the waters of Wells' creek.

That he was with Simon Kenton when he run a part of his 2,200 acre survey, and remembered that they run some lines between Byne's survey and his settlement, but did not remember that they bound on Byne's line, but thought they joined his settlement line, and extended north as far as a forked ash, his north-west corner.

John Lyon deposed, that in the month of April, 1776, he, in company with others, came down the Ohio to the mouth of Cabin creek, where they met with Simon Kenton, who came with the company to the mouth of Limestone, where himself and one William Markland stayed at the camp, which said Kenton went out with the company to improve.

That they stayed in camp until he had grained a number of deer skins; and one of those that went out, to-wit, Rezin Virgin, returned and conducted him up Limestone to the head, and then turned to the right hand to where they had been encamped.

That the rest of the company had returned by another way to Limestone, and that they also returned and there met them; that from thence they set out again and came by where Kenton had a camp, on Lawrence's creek, from whence they proceeded to the same camp that he had been first conducted to, and some where not far from thence they saw improvements, said by some of the company to have been made by Wells, or Wells and company.

That he does not know that any particular name was given to that water course, now called Wells' creek, or to any of its branches.

Peter Lee deposed, that he lived in the neighborhood ever since the beginning of the year 1785, and on the waters of. the creek called Wells' creek; that he never had heard of any distinction made by any person, not even Simon Kenton himself, of Wells' creek and Wells' branch, until since the commencement of this suit; but always understood the whole stream was known by the name of Wells' creek, or branch, and the different branches waters thereof.

Elijah Berry deposed, that he first became acquainted with Wells' creek and the neighborhood in the latter part of the year 1784, and has been acquainted with it ever since; that he lived several years in a station with Simon Kenton, and never understood from him, or any other person, that there was a distinction made in the

name of any particular branch of said creek; but that the whole stream was known by the name of Wells' creek, or branch, and the several branches of it waters thereof, until the present suit.

James Kelly deposed, that he, in company with some others, came down the Ohio to the mouth of Cabin creek, in the month of April, 1776, and there met with Simon Kenton, who came with them to the mouth of Limestone, where they requested said Kenton to pilot them through the country where they meant to make improvements.

That he conducted them to a camp of his on Lawrence's creek; from thence they went through high cane, and when they got clear of the cane they came to open woods, where they turned to the left and traveled some distance and encamped.

That himself and some others went out to improve, and in their tour discovered some improvements, and on their return spoke of seeing them; and he thought it was Kenton answered and said they were made by Wells, or Wells and company; that he does not remember of any creek having a particular name but Lawrence's creek.

That he does not recollect that any name was given at that time to any branch upon which they improved, further than the waters of Licking.

Alexander D. Orr deposed, that he was present some time during the last fall, when the deposition of Nathaniel Hixon was taken in the suit of *William Ward* v. *William Wood, Simon Kenton, and the heirs of Arthur Fox*, and perfectly recollected that the said Ward admitted and agreed that what the said Hixon had sworn to in his deposition relative to the said Wood's having forewarned him, the said Ward, from settling on the land now in dispute, was true.

That he has made several entries, and that it was customary to call for lines and corners of surveys without the locator's having any other knowledge thereof, except what he could acquire in the surveyor's office.

That he has been acquainted with the part of the country where the lands in dispute lie, ever since the year 1784, and has never known any part of that stream known by the name of Wells' branch, till the law suit was commenced between the parties; but has known the whole stream by the name of Wells' creek, till the commencement of that suit.

Nathaniel Hixon deposed, that shortly after William Ward arrived in this country, with part of his family, he went in com-

pany with Richard Corwine and William Wood, one of the defendants, to the house where the said Ward lived, being near the place where the said Ward now resides; and in his presence the said Wm. Wood forewarned the said Ward from using or taking possession of the land where he had settled, as the said Wood claimed it; upon which the said Ward informed the said Wood that he should continue where he was; and told the said Wood if he would wait, he should see his negroes in the act of deadening some trees.

That he owns a lot purchased of William Wood and Arthur Fox, which is situated about 20 or 25 poles south of a line running east from the south side of Richard Corwine's lot, and about 45¾ poles east of a line running south from the east end of the said lot.

That the bond he has for the said lot calls for the town, and he considers it within the town, and he expects to be paid by William Wood and Arthur Fox, in case the lot therein mentioned is lost.

Abner Overfield deposed, that he landed at Limestone in the year 1784, in the month of November, and that before he saw he heard of Wells' creek, in the county of Mason, and that in six weeks' time after his arrival he knew it, and he has always heard it called and known by the name of Wells' creek, and never heard any distinction between Wells' branch and Wells' creek.

That the branch running by Dexter's camp was called Wells' creek waters.

That he first became acquainted with Arthur Fox the last of February or first of March, 1785, at Simon Kenton's station, near Washington.

That he lives on and owns part of the 2,200 acre survey, in the name of Simon Kenton, near the town of Washington, which he purchased in February, 1788, of Arthur Fox and William Wood, but does not remember that Arthur Fox told him it was surveyed, but believes it was, for Fox told him there was a space of 100 poles between Clark's and McKinley's pre-emption, which was part of the land sold to him as part of the 2,200 acres.

Luther Colvin deposed, that the line he showed to the surveyor is the same line he carried the chain on for said A. Fox, deceased, in making, and that in its progress it passed by Dexter's camp, and run near Dougherty's cabin.

That the line he has spoken of he understood was to divide Ward's land and Wood and Fox's, and that the land on the south side of the said line was then called Major Ward's.

That he has lived in the neighborhood above twelve years, and

has never heard any distinction given to Wells' creek from the head to the mouth; only Wells' creek and Wells' creek waters.

Aaron Wells deposed, that some time in the fall of the year 1798, as well as he remembers, he settled, by agreement with Fox, at a place called Wood's spring, near the town of Washington; and at that time the said Fox showed him a line running north and south, which crossed the Limestone road about 30 poles east from the said spring, and near where the left hand fence from the spring, in an eastward direction, now forms an angle and turns northward, and directed him to clear land any where on the west side of said line, but that he must not clear on the east side, as the land belonged to one Ward, who lived in Green Brier.

That about a year after he settled at Wood's spring, he heard said Fox say he intended to contend for the land east of said line, which he at first had forbid him to clear.

That the spring he calls Wood's spring rises at a place called Fox's station.

Robert Wells deposed, that some time in the fall of the year 1788, as well as he remembered, he, by agreement with A. Fox, deceased, settled at a spring near Washington, called Wood's spring, and was at that time shown a line by said Fox, running north and south, which crossed the Limestone road about 30 poles east from the spring, and near where the left hand fence from the spring, in an eastward direction, forms an angle, and turns northward; and he was further directed by said Fox to clear land any where on the west side of said line, but that he must not clear on the east side of said line, as the land belonged to one Ward, who lived in Green Brier.

But that about a year after he settled at Wood's spring, Mr. Fox told him he intended to contend for the land he forbid him to clear when he first settled there.

Jonathan Stout deposed, that about ten years ago, as well as he recollected, he applied to Arthur Fox, now deceased, for two out-lots, adjoining either back street of the town of Washington; Mr. Fox's reply was, that all those out-lots were sold or engaged; at the same time said Fox referred him to Mr. Andrew Tompson, and said that the said Fox believed that said Tompson would let him have his lot. Accordingly he applied to said Tompson, and he in part agreed, upon condition that he would pay Mr. Fox the purchase of said lot; after which he, said Fox, agreed to take his bond for the purchase money of said lot.

That said Fox then agreed to go with him and show him the corners of said lot; that when they came to the lot the said Tompson had altered his mind, and had began to clear land; that he then applied to said Fox for lots adjoining it to the south thereof, and said Fox replied that this is the line of the out-lots, alluding to the line of the lot he then stood on.

That he then asked said Fox, who owned the land adjoining, meaning the land to the south, and that said Fox replied, one Ward, in old Virginia; that the lot spoken of above was the same since known by the name of Richard Corwine's lot.

That in conversation between Ward and Wood, said Wood repeatedly said that he had forewarned him, and said Ward's reply was that he did not regard that, or to that purpose, and that he need not think to keep him out of his right by such means as that.

That the land then in dispute, which were then town lots he understood Ward had taken possession of, he could not say would include Ward's house, but would include a part of his possession.

Richard Ayres deposed, that some time in the beginning of the month of June, 1790, he was present at a conversation between William Ward and Arthur Fox respecting some part of the lands on which the town of Washington is situated; Ward said that part of the said town was on his land; Fox denied it, and said that Ward never had a north-west corner made to his survey, and that if the said Ward was confined to his distance called for in his plat and certificate, which was 565¾ poles, it would not interfere with the said town.

Then the said Ward and Fox agreed to go and measure the line from said Ward's south-west corner to a large white oak and two hickories, and run north; that he was, together with Joseph Merrell, applied to to carry the chain, and that he, as well as the said Joseph Merrell, went with the said Ward and Fox to the said south-west corner, and run north 565¾ poles, and it passed the corner of the said town about ½ pole, with a chain which measured 33½ feet long.

That since that time, to-wit, about the last of the same month above mentioned, he, together with William Ward and William Henry, went, and he saw them, the said Ward and Henry, mark a north-west corner, on a sugar-tree and hickory, 61 poles further north than the distance called for in the said Ward's plat and certificate, making in the whole 626 poles from the said south-west corner.

Ward v. Fox's Heirs.

James Ward deposed, that he came to the land in dispute in company with William Ward, about the beginning of April, 1790; that on the day after, in Washington, he met William Wood, one of the defendants, and after he was informed who he was, and that said William Ward was come to the said land, he said that he would call and see said Ward on the next day, which he did, in company with Arthur Fox; there they had a conversation with said Ward respecting said land, at which he was present, in which said Fox informed said Ward that he had finished the surveying the said land, agreeably to the directions of William Henry, by beginning at said Ward's third corner and measuring his distance, and marked a large sugar tree for the fourth corner of said survey, and that both him and said Wood pretended to show the line from said sugar tree, and pointed at a tree which they said was the line between them and the said Ward; that the above mentioned sugar tree stands about 40 poles south of a line running west from the south-west corner of Corwine's lot.

That some time after the said Wood came to where the said Ward was at work on the said land, being then present, and again showed the said Ward the said line, running from said sugar tree to Ward's beginning corner, and discharged him from improving to the north of said line; but at that time seemed to lay no claim to the land lying to the south of said line.

That about one year and a half after that time he heard the said Ward ask said Wood and Fox where their claim extended to; that Wood answered that the line crossed the branch on which said Ward now lives, at or near to Dexter's camp. That said Fox contradicted him by saying that the line crossed said branch at another place, near a quarter of a mile still lower down; that said Wood replied that he had marked the said line; that then said Fox replied that said Wood did not mark said line, and was not along when it was run; that said Wood then said that if he did not mark that line he never did any thing.

That some time prior, as he believes, to the commencement of this suit, he heard either Wood or Fox (but believes that it was Fox) say that he laid no claim to the land south of the line running from the above mentioned sugar tree to Ward's beginning corner, but said that perhaps Johnston and Craig might dispute for it.

That he does not consider himself interested in this dispute; that he has an obligation on William Ward for 200 acres of his

survey, but that he is living clear of the dispute, and on the land pointed out by William Ward as satisfaction of his bond.

That he looked on this bond as a present only; that William Ward had frequently promised when he was a youth, that if he would stay at home and attend to his business, that he should be a sharer in his gains abroad. That he is a brother of William Ward, and that their father died in 1774, without any will that he has ever heard of.

Thomas Marshall deposed, that some time late in the summer, or early in the fall of 1785, Arthur Fox, who was a deputy in his office, as surveyor of Fayette county, informed him he had discovered a vacancy of land, and wished to get a warrant to enter on it, in consequence of which, and his confidence in the said Fox, he employed him to make the entry of 600 acres for John Marshall, which is entered October 7th, on the waters of Wells' creek, and the North fork of Licking.

Thomas Bodley deposed, that he has frequently seen the handwriting of Arthur Fox, deceased, who, when alive, resided in the town of Washington, in Mason county, and thinks he would know it from almost any other person's; that he has examined the original entry made in the surveyor's office of Fayette county, of which the annexed is a copy (to-wit, John Marshall's entry of 600 acres, entered October 7, 1780), and that he is of opinion and verily believes that the said original entry is made in the hand-writing of the said Arthur Fox.

"*October* 7, 1785.

"John Marshall, Jr., assignee of Thomas Marshall, etc., withdraws 1,400 acres from his entry of 14,150, on six treasury warrants, No. 6,701, 12,974, 6,704, 14,582, 1,427, and 1,128, made in book 5, and page 35, from that part which lies above the mouth of Tigert's creek, to join the river and the said creek, on the upper side, and re-enters 800 acres of the same on the north side of the North fork of Licking; beginning at a mulberry and buckeye, on the bank of the North fork of Licking, on the north side thereof, corner to a survey of 322 acres in the name of Edmund Byne; thence east with said Byne's line, passing his corner, and with another of said Byne's line of a survey of 500 acres, the same course to an intersection of Samuel Strode's survey of 500 acres; thence with said Strode's head line of south 40 east, passing his corner and continuing said course to the said North fork; thence down the same and binding thereon to the beginning.

" Also 600 acres, the balance that is withdrawn, and re-enters the same on the north side of the North fork of Licking, on the waters of Wells' creek, and the next branch above that; beginning at the south-east corner of William Ward's survey of 2,000 acres, a small hickory and buckeye; thence west with Ward's line to a line of Simon Kenton's of 2,000 acres; thence with said Kenton's line south to a line of Edmund Byne's; thence with said Byne's line east to a line of John Tebbs' pre-emption, heir-at-law to Thomas Tebbs; thence with said Tebbs' line, north 51 east to a line of Andrew Crockett's pre-emption, assignee of Angus Cameron; thence with said Crockett's line west to a line of the above mentioned William Ward, and with the same south to the beginning."

Robert Parker deposed, that he was well acquainted with the hand-writing of Arthur Fox, deceased, who, when alive, resided in the town of Washington, in Mason county; that he has examined the original entry made in the surveyor's office of Fayette county, in the name of John Marshall, of 600 acres, dated October 7, 1785, of which the annexed is a copy, and verily believes that the said original entry is made in the hand-writing of the said Arthur Fox.

The following entries and surveys were read at the trial:

"———, 1783.

" John Marshall, Jr., assignee of Thomas Marshall, who was assignee of John Marshall, enters 4,000 acres of land, on the remaining part of a treasury warrant, No. 12,971, beginning at Simon Kenton's lower corner in John Marshall's line, on the south side of the North fork of Licking, and running thence with the said Marshall's line to Richard Wade's settlement and pre-emption; thence with Wade's line to his north-east corner, and from thence with his south line, 246 poles; thence from the beginning in Kenton's line, running with the said line eastwardly so far as it does extend, and from the end of the 246 poles on Wade's line aforesaid, eastwardly, and parallel to the line of the said Kenton, until the said parallel line and the corner of the said Kenton's line continued, will include the quantity of waste or vacant land required."

"*Fayette county, April 7, 1786,*

"Surveyed for John Marshall 4,000 acres of land, by virtue of an entry made January 11, 1783, upon part of a treasury warrant,

No. 12,971; beginning at the lower corner of Simon Kenton's survey of 2,000 acres on the north side of the North fork of Licking, at a large red oak; thence east, 640 poles, to another of said Kenton's corners, a buckeye and mulberry; thence south, 1,140 poles, to a sugar tree and hoop wood; thence west, 400 poles, crossing Lee's creek to the most southwardly corner of Richard Wade's pre-emption; thence with said Wade's line north 45 east, 246 poles, to his most eastwardly corner, a buckeye and sugar tree, on Lee's creek; thence with his line north 45 west, 870 poles, to the corner, to two large sugar trees, the same being corner to a survey of 14,717, made for John Marshall, Jr.; thence with said Marshall's line north 1½ west, 385 poles, crossing the north fork of Licking to a honey locust, buckeye and hickory, standing by an old camp; thence with another of his lines, north 69 east, 174 poles, to the corner of George Dickens' pre-emption in Simon Kenton's line, a white oak and dog wood; thence with said Kenton's line south, 100 poles, to the beginning."

"*December* 7, 1785.

" FAYETTE COUNTY, SCT. Surveyed for Simon Kenton 300 acres of land by virtue of an entry made 27th of May, 1780, on a treasury warrant, No. 3,777, situate, lying and being on the second right hand fork of Lawrence's creek, that heads with the waters of Licking, and bounded as follows, to-wit : Beginning at two large black walnuts, buckeye and sugar tree on the south-east side of said fork; thence west, passing Thomas Williams' settlement corner, and with the same west, 167 poles, to a white oak, white ash, and forked sugar tree, corner to said Williams, and in a line of William Stewart and George Tompson's pre-emption; thence with their line south, — poles, to two buckeyes and white thorns, corner to said Stewart and Tompson, and with the same west, 54 poles, to two box elders and hackberry in said line; thence south, 204½ poles, to a hackberry and three sugar trees; thence east, 221 poles, to two box elders, two buckeyes, hickory and mulberry, in the head of a hollow; thence north, 221 poles, to the beginning."

"*April* —, 1785.

" Arthur Fox, assignee, enters 1,000 acres of land on part of a treasury warrant, No. 14,580; beginning 20 poles north of George Clark's south-east corner of his pre-emption, on the waters of the North fork of Licking, and corner to a survey of Simon Kenton of 2,200 acres, and running with a line of the same east, 400 poles, to

a line of survey of said Kenton of 2,000 acres, and with the line of the same south, 400 poles; thence west, 400 poles; thence north, 400 poles, to the beginning.

"*January* 1, 1783.

Simon Kenton, assignee of Humphrey Marshall, etc., enters 2,000 acres on part of a treasury warrant, No. 8,976, for 5,000 acres; beginning at the mouth of Wells' creek, a branch of the North fork of Licking, about two miles below the war road, from Limestone to the Lower Blue licks, to run thence 320 poles up the Main fork, binding thereon on the north side, and also 320 poles down the North fork, binding thereon on the said north side, then at right angles with the general course of said line when reduced to a straight line northwardly including the quantity, with a line parallel to the said reduced line."

The following decree was pronounced:

BY THE COURT.—After having examined the exhibits in this cause, and attentively considered the arguments, the court are of opinion, from the face of the record, from the facts established, from an examination of Ward's entry, and from the testimony of Young, Beckley, Berry, Lee, Orr, and Triplett, and from Cameron's pre-emption entry, that the distinction between Wells' branch, and Wells' creek was unknown at the time Ward's entry was made, and for a long time afterward. And that the branch which emptied immediately into the North fork of Licking was the one the mouth of which was intended by the entry. Under this impression, it remains to give that consideration to Ward's entry which will embrace his most material and best established calls.

He calls to adjoin Cameron's settlement and pre-emption on the west, and Beckley's on the south; let him then adjoin those claims properly laid down, and let the call for the head of the branch, which is considered as in Beckley's claim, be rejected as surplusage, he will then by extending the length of Cameron and Beckley's lines, and running down the creek or branch, be enabled to include its mouth on the North fork. This, then, is the legal position of Ward's claim, and he thereby embraces his most important calls. Let us now inquire what lien Ward had on Kenton's entry of 2,200 acres, what the nature of that lien was, when it commenced, and to what extent it reached. It appears that no interference would have taken place had Ward's claim been surveyed agreeably to location. Kenton having caused Ward's claim to be surveyed to

the best of his skill, and supposing his own claim would not interfere, sells to Wood and Fox for a valuable consideration his interest in the entry of 2,200 acres.

It appears then from the complainant's own showing, and the answer of Kenton, that no interference was contemplated by Kenton; he then was guilty of no fraud. The fraud, if any, must have commenced in 1788, when the survey on the 2,200 acres was made. Wood and Fox could not partake of fraud from Kenton when they purchased of him. In what relation could the property stand to Ward at that time, to give him a lien on their claim originating *bona fide*, and for a valuable consideration. They were answerable neither to Kenton or Ward for the manner in which they might survey their claim, the law had prescribed their duty, and by its directions they were to stand or fall. If Ward could have any lien on Kenton's claim, it must be by an agreement known only to themselves, or an equitable construction of that agreement. Ward acquits Kenton of fraud, and consequently had Kenton retained his entry of 2,200 acres, Ward could have had no lien on it for an eventual loss in the survey of 2,000 acres, having retained as a security for Kenton's faithful performance of his agreement, the title to the whole tract. The contingent equitable claim of Ward did not necessarily arise from the nature of the contract with Kenton, because the land eventually saved under the military warrant was the only pledge for the faithful performance in the contemplation of the parties at the time of their contract. It appears then to the court, that the lien of the complainant could not exist at the time of making his agreement with Kenton, because Kenton's entry was not then made.

It could not commence at the time of the sale made by Kenton to Wood and Fox, because Kenton was guilty of no fraud, and his claim of 2,200 acres was an entire distinct and separate claim from Ward's. It could not commence when the survey of the 2,200 acres was made, or registered, because no relation, or responsibility existed from Wood and Fox to Ward.

Much was said at the bar respecting the notice of the interference possessed by Wood and Fox; it appears by the various pretensions set up by them to a part of Ward's claim, that they were in a state of complete uncertainty with respect to their claims, although it appeared that they had some knowledge of the relative situation of the claims contiguous to the contested ground, yet they knew not the precise legal position of Ward's, or their own

claim. So various were the opinions respecting the mode of surveying claims, that they must have been incapable of determining, and as far as respected their claim of 2,200 acres, after repeated experiments they did not return their survey until August 10, 1788. The progressing claims to land in Kentucky appear rather to be imperfect legal titles than equitable claims, as such notice of prior claims can only be shown of record, and the English doctrine of notice does not apply; there it is applied to contests between equitable interests arising out of the same subject of property, and in such case a purchase of a second equitable interest even carried through all the legal forms, may be avoided by proof of notice of the first; but we claim our titles from the state under distinct and separate entries, on which no person claiming under a different entry can have any lien, unless by agreement express or implied, and the merits of our claims are to be determined from the face of the record.

There can be no doubt that actual notice of a pre-existing equitable interest, or a reasonable opportunity of obtaining that notice, must operate to the defeat even of a legal title, but that equitable interest must arise necessarily from or be attached to the subject from which the equitable interest arises, and must not depend on a combination of contingent circumstances, out of the reach of others, because subsequent purchasers can not, by a reasonable industry and attention, trace the lien which a man may have on a tract of land, they can not possibly guard against fraud, and the first purchaser of an equitable interest must resort to the person in whom he confided, and not be at liberty to pursue that title to the land in the hands of a man who is no more censurable than himself.

If the complainant obtains a decree in conformity to the prayer of his bill, he retains, in addition to the 2,000 acres to which his warrant would entitle him, 528 acres of surplus land, and Kenton is again restored to land which he sold to Wood and Fox, and for which he has received a valuable consideration; for these reasons the court decree that the complainant's bill be dismissed, with costs, etc.

From this decree the complainant prayed and obtained an appeal, and now at this term the cause came on to be argued.

MURRAY, for appellant.—The first question is, how ought the survey to have been made on William Ward's entry?

The calls are, "on a branch of the North fork of Licking, called Wells' branch, including the mouth thereof, adjoining Cameron's settlement and pre-emption on the west and Beckley's on the south, to begin at the head of the branch, and to run down for quantity."

There is a contrariety of testimony with respect to what was the water course known by the name of Wells' branch at the time this entry was made. From the head to the mouth, what is now called Wells' creek, never was called Wells' branch.

John Virgin proves that the branch on which Ward has surveyed was called and known as Wells' branch from 5 to 6, as early as 1776, and his testimony is supported by McCausland and the answer of Kenton. Henry also concurs with them with respect to the distinction at a later period.

The attempt made to affect the credit of Virgin has not succeeded; Warring proves he had his recollection, and the story of the horse can not affect his credibility.

The testimony on the part of the appellees is negative; they do not know, or have not heard of the distinction between Wells' creek and Wells' branch; but it is a rule that the testimony of one positive witness shall countervail the testimony of ten negative witnesses. 1 Lofft. Evid. 294.

The call for the head of the branch must be rejected, because it is in Beckley's pre-emption (see the case of *Pawling* v. *Merewether, ante,* p. 26), and in order to ascertain the true situation of Ward, we must first fix Beckley and Cameron.

There can be no doubt, on the authority of *Frye* v. *Essry,* but that the point half way between the spring on Wells' creek and the spring which is the head of another water of the North fork, should be the center of a survey of the settlement, the lines to the cardinal points, and that the pre-emption should adjoin it all around with lines of the same course.

Beckley must lay in a square, including the head of Wells' creek and Lawrence's creek, and whether Ward is to adjoin his settlement, or his settlement and pre-emption, will make no difference as to the land in dispute.

But if there is a doubt what is meant by Wells' branch, it is a call which ought to be rejected, and then the rule for extending the survey would be by lines extending from and at right angles to Cameron's west line.

The next inquiry is, whether admitting the entry of Ward to be improperly surveyed, and as between two strangers, that Wood and Fox's heirs, by virtue of their survey and patent, on the entry of Kenton of 2,200 acres, have a right to hold the interference against Ward; situated as they are, Ward has not a right to a conveyance from them.

Kenton was the surveyor and locator of Ward's 2,000 acres; he was bound both to locate as the law directs, and to survey according to location.

He was entitled to a compensation for it, and could avail himself of no advantage by locating and surveying otherwise.

Wood and Fox were his assignees of an entry of 2,200 acres made by him in his own name, and calling to adjoin Ward's 2,000 acre entry. Assignees are subject to the same equity as the assignor. Pre. in Chan. 525–26; 1 P. Wms. 497. And can not stand on a better footing. 2 Vern. 565–66, 610, 765; 1 P. Wms. 130; 2 Eq. Ca. 87; 1 Stra. 244; 1 Ves. 123; 2 Ves. 519–20; Brown's Ch. 435–36; 2 Brown's Ch. 285–86.

But Wood and Fox were not only the purchasers of Kenton's equitable interest in the 2,200 acre tract, but purchasers with notice that Ward's claim was surveyed, and that it was done by Kenton's directions, at least Fox was, and Wood was his partner.

Henry was employed by Kenton to make the two surveys, and he employed Fox to finish them, and that Fox did undertake so to do is evident from his having returned to Henry the sugar tree at D as a corner.

It is impossible to suppose Fox was unacquainted with the situation of Ward's 2,000 acre survey; at the time he finished the survey of 2,200 acres, James Ward and Ayers prove a line running from R to A, and Fox said he had Henry's instructions to produce.

Before the agreement was made between Wood and Fox, and Kenton, Ward's survey was either recorded, or in Fox's or Henry's pockets, and Henry had made a part of the survey of 2,200 acres, the notes of which Fox had.

That he knew the true situation of Ward will appear by the entry of John Marshall of 600 acres, he made the 7th day of October, 1785, which is proved by the testimony of Col. Marshall, Robert Parker, and Thomas Bodley. Beside this, I refer the court to John Marshall's entry, and the survey on it, of 4,000 acres, which was executed by Fox as a deputy, Kenton's 300 acre survey, Cameron's settlement survey, and Dickens' survey, and to Arthur Fox's entry for 1,000 acres, and to Kenton's entry for 2,000 acres, calling for the mouth of Wells' creek.

This entry of 1,000 acres, which was made ———, proves Fox had finished the survey of 2,200 acres, because in that entry he calls for Clark's corner and Kenton's line.

The fraud may be sufficient to prevent Wood and Fox from sheltering themselves under their legal title, and yet be no actual deceit.   Ca. Tem. Talbt. 40.

The conduct of Wood and Fox at different times, the different claims they set up as lands rose in value (see Stout, James Ward, Robert Wells, and Ayres), is strong evidence of fraud.

But it is contended that the disputed land is all surplus.   This is made out by the surveyor in a very curious way, the lines are all of different lengths, and yet they are multiplied together to give the contents, as if the figure was a right-angled figure, and the parallel lines of equal length.

HUGHES, for appellees.—The appellant, who was complainant in the court below, claims by virtue of an entry on a military warrant, made April 20, 1780, for 2,000 acres.

The appellees, under an entry on treasury warrant, made the 20th of June, 1780.

In the inquiry whether the decree of the district court ought to be affirmed or not, the two questions stated in the opening of the cause naturally arise:

*First.* Can the appellant, by virtue of his entry of 2,000 acres, and his consequent survey thereon, recover of the appellees?

*Second.* If he could not recover on the strength of his own claim, are there any circumstances attending this case, which gave him a right to recover against Wood and Fox's heirs?

*First.* Would his claim, if surveyed according to location, cover the disputed ground?

The entry of the appellant has five calls, to-wit:

*First.* On the branch of the North fork of Licking, called Wells' branch.

*Second.* Including the mouth thereof.

*Third.* Joining Cameron's settlement and pre-emption on the west and Beckley's on the south.

*Fourth.* To begin at the head of the said branch; and,

*Fifth.* To run down for quantity.

From the words of the entry and the face of the plat, the branch of the North fork of Licking is Wells' creek, or branch, from the head to the mouth.

Perhaps because this is so apparent, it was that in setting forth the entry in his bill, the appellant described the branch as a branch of *a*, instead of *the* North fork of Licking.   This, indeed, would have given some color to Kenton's absurd and improbable story;

then might the water course from *C* to *D*, have been called Wells' branch, and from *C* to the North fork, *a north fork* of Licking. But not so is the entry in the original book.

I will now examine how the testimony applies to the name of this water course.

Virgin is the witness most relied on by the appellant; he speaks of a branch down which there was a blazed path, which he understood was blazed by Wells and company, who had been improving in the neighborhood, and had marked the trace from the river to the improvement.

He seems to understand the distinction between Wells' branch and Wells' creek, and that they were so called, but can not tell who told him so. This man, by McCausland's account, must have been about ten days in this neighborhood. And he is contradicted by Young as to the blazed path.

McCausland seems to have understood that there was a branch and a creek, but he does not seem to be certain where it was Wells' branch and where Wells' creek, and has not been there since.

Henry was told by Kenton of the distinction in 1783 or 1784.

This testimony is met, on the part of the appellees, by the depositions of Young, Triplett, Markland, Beckley, Berry, and Peter Lee.

The testimony of these witnesses is not negative. We are in pursuit of the generally reputed name of a water course; these men knew the water course and its general name. It is called negative, because the advocate for the appellant sets up Kenton's intention instead of the calls of the entry; we do not pretend to inquire into this intention, and either to confess or deny it.

But we produce the witnesses most likely to know the distinction as to the branch and creek, had it existed and been known; this testimony is only negative, as it operates as a denial of what Kenton intended.

Kenton has, in making the entry of 2,200 acres, which was made one month only after Ward's, unequivocally declared his intention as to the situation of Ward's, that is, that it should extend down the creek from Beckley and Cameron's settlements and pre-emptions to the mouth on the North fork, for he calls in his own entry to adjoin Ward on the north-west side, and Ward will not present a north-west side surveyed in any other way than that which we contend for.

Kenton's conduct can be easily accounted for; a year or two afterward, he made the entry of 2,000 acres on Wells' creek and the North fork, and having thus, whether fraudulently or accidentally, laid more claims on the ground than there was land to satisfy, it became necessary to change the position of one or other of them.

*Third.* Joining Cameron's settlement and pre-emption on the west and Beckley's on the south.

It is not material to the appellees how the settlements and pre-emptions are directed to be laid down, to enable Ward to adjoin; there can be no interference.

*Fourth.* To begin at the head of the said branch.

Whether this call is rejected or retained is also immaterial, but I suppose the call ought to be rejected, for the head of the branch will be in a settlement and pre-emption.

*Fifth.* To run down for quantity.

This call is superfluous, being intended by the others to begin at the head, or adjoining Beckley and Cameron, and to include the mouth.

The appellant's entry does not cover the land in dispute, and beside the being out of his entry, the whole of the quantity contained in the interference is surplus in his survey as made.

It is true the surveyor has made a mistake in calculating the contents, but it is only for a few acres. We have the courses and length of the lines, and can not be deceived as to the quantity.

*Second.* Are there any circumstances in this case which give the appellant a right to recover of Wood and Fox's heirs?

Fraud is suggested in the bill.

It will be necessary to inquire, what are the charges of fraud, how supported, and to whom they attach?

The first charge is, that on the division in April, 1790, Kenton gave Ward no notice that the west end of the survey was interfered with; this may affect Kenton as to his claim against Ward for a part of the land for his services, but can not affect Wood and Fox's heirs.

Wood and Fox purchased of Kenton, among other tracts, his entry of 2,200 acres, without any condition annexed, that, in consequence of any agreement either expressly made by Kenton with Ward, or implied, they should not, by virtue of the transfer, avail themselves of all the legal consequences of the location.

But this division took place after all Kenton's interest in the 2,200 acre claim was gone.

The sale to Wood and Fox was in 1785, and the survey was made in 1788.

The next charge is, that Wood and Fox had complete notice of the manner in which Ward's entry had been surveyed before their purchase from Kenton, and before the time of making the survey of 2,200 acres.

Before I inquire whether this charge is supported, I will consider what would be the effect of it were it proved.

If Kenton had the legal title to the land in dispute, and had first agreed with Ward to sell to him, and had then sold to Wood and Fox, notice to Wood and Fox at any time before they paid the purchase money, and obtained a legal title, would have bound them.

Relief is given against a second purchaser with notice upon this principle, that the person purchasing after notice, or going on to complete his title after notice, is a purchaser *mala fide*, because he agrees to take that which he knows the seller is bound to give to another.

The case which I have just stated is settled upon equitable principles between two claimants in equity, for their claims are considered at the time the notice attaches, and the subsequent act of acquiring the conveyance is considered as void.

The inferior court call the title to land, by entry or survey, an incomplete legal title, and not an equitable interest.

It is immaterial what it is called, but if Wood and Fox, by the purchase of the entry, bought an equitable claim, it was a claim against the commonwealth, and not against Kenton; and in order to obtain a complete legal title after such purchase, they were bound to comply with the rules and regulations of the land office, and the letter and spirit of the land law, and not to follow Kenton's directions.

It is true Kenton might have sold this entry upon condition, or with limitations or reservations, as that if in running out the claim agreeably to entry it should interfere with Ward's 2,000 acres as surveyed, they should release to Ward the interference.

No attempt is made to prove this, nor even that they knew the degree of responsibility attached to Kenton in making Ward's survey. For if Kenton surveyed Ward's claim in the manner it is surveyed by Ward's particular instructions, he would have a right to set up his own claim under the entry of 2,200 acres to that part of it which was out of the entry.

But if Kenton made the survey in that manner of his own wrong to affect Wood and Fox, it was necessary they should have had notice of it.

This. shows the distinction between the cases in the books and this case, and that the doctrine does not apply.

In this case Wood and Fox bought a claim against the commonwealth to land to which Ward had no claim, the land being appropriated by Kenton's entry, and Wood and Fox being, in order to save themselves as to other claims, compelled to adjoin Ward according to entry.

Ward himself seems to admit that to charge Wood and Fox, it was necessary to prove they had a knowledge of the manner in which the survey of 2,200 acres had been begun, and was to be surveyed, for he makes it a charge.

The bill further charges, that Kenton, twelve months before he sold to Wood and Fox, had directed the manner of surveying the 2,000 acres as now surveyed, and the 2,200 acres to adjoin it as surveyed; and informed them it was Wells' branch and not Wells' creek he meant, and that they not only knew the line but showed it to others. I will now go on to show how far these charges of fraud are supported, and to whom they attach.

The first that Kenton gave notice, Kenton has admitted, and he certainly had a right to do so, so far as to charge himself, although his answer can be no evidence against Wood and Fox. 1 P. Wms. 300–1. For this fraud let him compensate Ward.

Here let me ask, why was Kenton made a defendant? No relief is prayed against him. Ward has, except as to a small part, and there the conveyance has been made *pendente lite*, his remedy in his own hands, the patent has issued to him, and by his own showing there is more than land enough to satisfy him.

As to the next charge, the notice of making the two surveys, what is stated in Kenton's answer, is contradicted by Henry's memorandum..

That memorandum shows that the survey was begun with a view to adjoin Ward, in finishing the survey on the north-west side. But in doing what that memorandum contains the notes of Kenton had not made the line of Ward, a 'line of the survey of 2,200 acres, until he passed it; for he had run with no line of Ward's.

That they had complete notice of the manner in which Ward's 2,000 acre survey was made, is by no means proved; Fox denies

it in his answer; Henry's two depositions do not certainly prove that he returned the survey with a corner furnished him by Fox, for Henry doubts about it himself.

But if it was proved, it amounts to nothing; it is proof only, that Wood and Fox knew that Ward's survey had been so made as to contain 2,528 acres upon a warrant for 2,000 acres, and that all the surplus was out of his entry. Kenton himself would have had a right to take what was out of Ward's entry, leaving him his quantity.

As to the last charge it may be true, that twelve months before Kenton sold, he had directed the mode of surveying the 2,000 acres, but what relates to the 2,200 acres is not true, as I have before shown.

That he informed them where the line was, is not proved, or that he told them what he meant by Wells' branch.

That they showed the line is proved only by one witness, which is not sufficient against the denial in the answer. 1 Atk. 288; 2 Eq. Ca. Abr. 247–8; 2 Atk. 19, 140; 3 Atk. 408; Doug. 788; 2 Bac. 294; 1 Ves. 125; 1 Eq. Ca. Abr. 229; 2 Vern. 554-5.

The fraud in this case is the combination of Ward and Kenton to cheat Wood and Fox's heirs.

Ward has the legal title to the 2,000 acres, as appears by his answer to Lee and Orr's bills he is entitled to but one-half, he has 2,000 acres without this interference, and the whole of this interference is out of his entry.

Yet he chooses to take this in a division, and to give Kenton other land, in order to take from Wood and Fox for Kenton's benefit, land Kenton had sold to them.

MURRAY in reply.—Wood and Fox purchased with notice of Ward's equity against Kenton.

They knew Kenton was the agent of Ward.

It is not necessary to prove that Wood and Fox knew the situation in which Kenton stood in relation to Ward, for they are liable as his assignees. Ward in this case shall not be compelled to abandon his native equity against Wood and Fox, and resort to his alien equity against Kenton, and take worse land than that he has chosen.

BY THE COURT.—It is not necessary to ascertain whether the appellant's survey was or was not made conformably to his entry. It is clearly proven, that Kenton, one of the defendants in the court below, for a valuable consideration, did undertake and actu-

ally direct the manner in which the survey has been made; certainly then he was bound to make it properly, and if he did not, was answerable for the consequences.

It would therefore be highly absurd, that he should have it in his power by any entry of his own, to take advantage of an error, if there be one committed by himself, or in other words to take advantage of his own wrong. And it would be equally absurd to suppose he could transfer a right to others of which he had in this way divested himself.

It has never been doubted, but that a conditional or dividing line agreed on by two claimants of land, would equally bind the assignee of either of them, and that case appears very similar to the one in question. From these considerations, and from the general principles of equity, which are applicable to every question for land, wherein the conflicting claims have distinct origins, and wherein the being a purchaser for a valuable consideration without notice, can never be pleaded with success, it seems to this court, that all equity which bound Kenton's entry while it remained his, did follow it into the hands of those to whom he sold it. And therefore so far as Kenton's entry, and the survey made thereon by the appellees, is affected by the appellant's survey having been made contrary to entry, the appellees must sustain the loss, especially as the claim of the appellant is in other respects of superior dignity.

Wherefore it is decreed and ordered, that the decree of the district court herein given, dismissing the bill of the complainant, be reversed. But as it appears from the surveyor's report, that the appellant's said survey, which purports to be 2,000 acres, contains a much larger quantity; and as the surplus must have proceeded from an error in the surveyor, over whom in this respect, Kenton had no control, and for which he was not answerable (it not having been proven, that the error was made by his procurement, or that he was privy to it), it seems to this court that the appellant ought not to hold that part of the surplus which is contained within the lines of the appellees' survey, and which will be excluded from the appellant's survey, by running his north and part of his west boundary line in the following manner to-wit: Beginning at the beginning corner of the appellant's survey, a mulberry and two sugar trees on the south boundary line of William Beckley's settlement, and running thence west or westwardly with said Beckley's said line, passing his south-west corner and continuing

Ward *v.* Fox's Heirs.

the same course with the appellant's north boundary line, 565¾ poles, thence at right angles from the last mentioned line to the south boundary line of the appellees' survey, thence west or westwardly with the said south boundary line until it intersects the west boundary line of the appellant's survey. Wherefore it is further decreed and ordered, that this cause be remanded to the district court, and that the court direct the said surplus to be ascertained by some skillful and disinterested surveyor, and also the remainder of the interference between the appellant's and the appellees' said survey, who shall be directed in performing the said services, to allow full and just measure and no more, and to make return of the quantities and the metes and bounds of the said surplus, and of the residue of the interference: Whereupon the court shall enter up a decree in favor of the appellant Ward, for all the remaining interferences, and cause him to release to the appellees, Wood and Fox's heirs, all the interfering surplus to be ascertained as aforesaid. And that the said court shall decree and order whatever else shall be found equitable and necessary to bring the cause to a final conclusion, conformably to this opinion and decree. And it is further decreed and ordered, that the appellees do pay unto the appellant the costs of this appeal, which is ordered to be certified to the said court.